UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. **09-21010** CR-COOKE

MAGISTRATE JUDGE
BANDSTRA

18 U.S.C. § 371
15 U.S.C. § 78dd-2
18 U.S.C. § 2
18 U.S.C. § 1956(h)
18 U.S.C. § 1956(a)(1)(B)(i)
18 U.S.C. § 981(a)(1)(c)
18 U.S.C. § 982(a)(1)

**UNITED STATES OF AMERICA**

**vs.**

**JOEL ESQUENAZI,**
**CARLOS RODRIGUEZ,**
**ROBERT ANTOINE,**
**JEAN RENE DUPERVAL,**
**and**
**MARGUERITE GRANDISON,**



FILED by _____ D.C.

DEC - 4 2009

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. - MIAMI

                    **Defendants.**
_____/

## INDICTMENT

The Grand Jury charges that:

At all times relevant to this Indictment, unless otherwise specified:

## GENERAL ALLEGATIONS

### *Legal Background*

1.      The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-l, *et seq.* ("FCPA"), prohibited certain classes of persons and entities from corruptly making payments to foreign government officials to assist in obtaining or retaining business. Specifically, the FCPA prohibited certain corporations and individuals from willfully making use of any means or

3

instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of money or anything of value to any person, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to a foreign official to influence the foreign official in his or her official capacity, induce the foreign official to do or omit to do an act in violation of his or her lawful duty, or to secure any improper advantage in order to assist in obtaining or retaining business for or with, or directing business to, any person.

2.      The Republic of Haiti's Penal Code Article 140 prohibited persons from corrupting or attempting to corrupt by promises, offers, gifts, or presents, an official, agent, or officer holding a position in any administrative, judicial, or military public authority, in order to obtain a favorable opinion; records, statements, certificates or assessments contrary to the truth; or positions, employment, adjudications, undertakings or other benefits of any type; or any other action by the department of the official, agent or officer.  The Republic of Haiti's Penal Code Article 137 prohibited any administrative, judicial, or military public official or any agent or officer of a public authority from accepting offers or promises or receiving gifts of promises to perform an action as a function of his position or his job, even one that is innocent but not subject to the payment of salary.

*Entities and Individuals*

3.      Telecommunications D'Haiti ("Haiti Teleco") was the Republic of Haiti's state-owned national telecommunications company.  Haiti Teleco was the only provider of non-cellular telephone service to and from Haiti.  Various international telecommunications companies contracted with Haiti Teleco to allow those companies' customers to make calls to Haiti.  These

2

telecommunications companies would pay Haiti Teleco a set rate for each minute of telephone calls to Haiti.

4.      From in or around May 2001, to in or around April 2003, defendant **ROBERT ANTOINE** was the Director of International Relations of Haiti Teleco.  In this position, it was **ANTOINE's** responsibility to negotiate contracts with international telecommunications companies on behalf of Haiti Teleco.  **ANTOINE** was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

5.      Corporation X was a privately owned telecommunications company that was incorporated in Nevada on or about July 1, 1996, incorporated in Florida on or about February 2, 2002, and was headquartered in Miami, Florida.  Corporation X executed a series of contracts with Haiti Teleco that allowed Corporation X's customers to place calls to Haiti.  Corporation X was a "domestic concern" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

6.      Defendant **JOEL ESQUENAZI** was the President and Director of Corporation X. In this position, he negotiated and signed contracts with Haiti Teleco on behalf of Corporation X. **ESQUENAZI** had signatory authority over Corporation X's bank accounts and had an approximately 75% ownership interest in Corporation X. **ESQUENAZI** was a citizen of the United States.  **ESQUENAZI** was a "domestic concern" and an officer, employee, and agent of a domestic concern, as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

7.      Defendant **CARLOS RODRIGUEZ** was the Executive Vice President of Corporation X.  In this position, **RODRIGUEZ** was in charge of overseeing Corporation X's finances.  **RODRIGUEZ** had signatory authority over Corporation X's bank accounts and had an approximately 20% ownership interest in Corporation X. **RODRIGUEZ** was a citizen of the United

3

States.  **RODRIGUEZ** was a "domestic concern" and an officer, employee, and agent of a domestic concern, as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

8.     The General Counsel ("General Counsel") was the Vice President and General Counsel for Corporation X.  In this position, the General Counsel drafted, negotiated and reviewed contracts, among other things.  He had an approximately 5% ownership interest in Corporation X. The General Counsel was a citizen of the United States.  The General Counsel was a "domestic concern" and an officer, employee, and agent of a domestic concern, as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

9.     From in or around March 1998, through in or around January 2001, Antonio Perez was Corporation X's Controller.  As Controller, Perez managed the accounting department, prepared financial statements, and sought approval for and paid bills.  Perez was a citizen of the United States. Perez was a "domestic concern" and an employee and agent of a domestic concern, as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

10.    Juan Diaz served as an intermediary between Corporation X and **ROBERT ANTOINE** from in or around November 2001, until in or around at least October 2003.   In or around November 2001, Diaz opened a business checking account at Kislak National Bank in Florida in the name of JD Locator Services, Inc., ("JD Locator").  On or about August 19, 2002, Diaz incorporated JD Locator in Florida listing its principal address as located in Miami, Florida.  Diaz was a citizen of the United States.  Diaz was a "domestic concern" and an agent of a domestic concern as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

11.    Co-conspirator A served as an intermediary between Corporation X and **ROBERT ANTOINE** from in or around January 2002, through in or around at least May 2002. Co-conspirator

4

A was the owner of Intermediary Company 1. Intermediary Company 1 was incorporated in Florida, listed its principal address as Miami, Florida, and had a bank account at Ocean Bank in Miami, Florida. Co-conspirator A is a citizen of Haiti. Co-conspirator A is an officer, employee, and agent of a domestic concern as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

12.      Co-conspirator B served as an intermediary between Corporation X, JD Locator and **ROBERT ANTOINE** from in or around November 2001, until in or around August 2002. Co-conspirator B was the Director of Intermediary Company 2. Intermediary Company 2 was incorporated in Florida, listed its principal address as Miami, Florida, and had a bank account at First Union Bank in Miami, Florida. Co-conspirator B was a citizen of the United States. Co-conspirator B was a "domestic concern" and an officer, employee, and agent of a domestic concern as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

13.      From in or around June 2003, to in or around April 2004, defendant **JEAN RENE DUPERVAL** was the Director of International Relations of Haiti Teleco. Similar to his predecessor **ROBERT ANTOINE**, it was **DUPERVAL's** responsibility to negotiate contracts with international telecommunications companies on behalf of Haiti Teleco. **DUPERVAL** was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

14.      Defendant **MARGUERITE GRANDISON** was **JEAN RENE DUPERVAL's** sister and served as an intermediary between Corporation X and **DUPERVAL**. **GRANDISON** was the President of Telecom Consulting Services Corp., ("Telecom Consulting"), a Florida corporation with its principal place of business in Miramar, Florida. On or about November 18, 2003, **GRANDISON** opened a business checking account in the name of Telecom Consulting with SouthTrust Bank in Miami, Florida. **GRANDISON** was a lawful permanent resident of the United States.

5

**GRANDISON** was a "domestic concern" and an and an officer, employee, and agent of a domestic concern as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

**COUNT 1**
**Conspiracy**
**(18 U.S.C. § 371)**

1.     Paragraphs 1 though 14 of the General Allegations are re-alleged and incorporated by reference as though set forth herein.

2.     From in or around November 2001, through in or around March 2005, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**JOEL ESQUENAZI**,
**CARLOS RODRIGUEZ**,
**and**
**MARGUERITE GRANDISON**,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire, confederate and agree with each other, and with other persons, known and unknown to the Grand Jury, including Antonio Perez, Juan Diaz, the General Counsel, Co-conspirators A and B, Corporation X, and Intermediary Companies 1 and 2, to commit offenses against the United States, that is:

(a)  to knowingly make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official, or any person, while knowing that all or a part of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official, for

6

purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist **JOEL ESQUENAZI, CARLOS RODRIGUEZ, MARGUERITE GRANDISON**, Antonio Perez, the General Counsel, and Corporation X, and others known and unknown to the Grand Jury, in obtaining and retaining business for and with, and directing business to Corporation X, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(a);

(b) to knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain signs, signals and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## PURPOSES OF THE CONSPIRACY

3.    A purpose of the conspiracy was for the defendants to unjustly enrich themselves by having **JOEL ESQUENAZI, CARLOS RODRIGUEZ, MARGUERITE GRANDISON**, along with Antonio Perez, Juan Diaz, the General Counsel, Corporation X, and other Co-conspirators, known and unknown to the Grand Jury, provide bribe payments to Robert Antoine and Jean Rene Duperval of Haiti Teleco, in exchange for business advantages to be bestowed upon Corporation X by Haiti Teleco. These business advantages to Corporation X included, but were not limited to,

preferred telecommunications rates, reduced number of minutes for which payment was owed, which effectively reduced the per minute rate, and a variety of credits toward sums owed. It was a further purpose of the conspiracy to defraud Haiti Teleco of revenue by obtaining these advantages for Corporation X.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which **JOEL ESQUENAZI, CARLOS RODRIGUEZ, MARGUERITE GRANDISON**, and their co-conspirators sought to accomplish the objects and purposes of the conspiracy included, among other things, the following:

4.      **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** would authorize the payments of bribes on behalf of Corporation X to the Director of International Relations of Haiti Teleco, an office held by Robert Antoine and subsequently held by Jean Rene Duperval.

5.      Corporation X would make bribe payments to Robert Antoine and Jean Rene Duperval and, in exchange, would receive various business advantages, including the reduction of Corporation X's debt to Haiti Teleco, and the continuance of Corporation X's connection to Haiti Teleco's telecommunication lines. **JOEL ESQUENAZI** would also give a Rolex watch to Duperval.

6.      To disguise the true nature of the bribe payments, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** would cause payments to be made for fictional "consulting services" to intermediary companies chosen by Robert Antoine and Jean Rene Duperval. To aid in the concealment of the bribe payments, **ESQUENAZI** and **RODRIGUEZ** would cause Corporation X to falsely record these payments as "commissions" or "consulting fees" on financial, banking, and accounting documents.

8

7.     One of the intermediary companies used to conceal and disguise the bribe payments was JD Locator, a shell entity used for the purpose of forwarding illicit payments to Robert Antoine. **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** would send funds and checks from Company X's bank accounts to Juan Diaz, for deposit in the JD Locator bank account at Kislak National Bank ("JD Locator bank account"). The money was intended for Antoine.  Over the course of the conspiracy, **ESQUENAZI** and **RODRIGUEZ** would cause over $600,000 to be transferred by wire transfer and check to the JD Locator bank account from Corporation X for purported "consulting services" when, in fact, such services were never rendered or intended to be rendered.

8.     Juan Diaz, at Robert Antoine's direction, would disburse the funds from the JD Locator bank account by various means including: (1) sending wire transfers to Antoine's Washington Mutual bank account; (2) issuing checks made payable to Antoine, which were then deposited into Antoine's Washington Mutual bank account; (3) withdrawing currency to be given to Antoine, some of which currency was then deposited into Antoine's Washington Mutual bank account; and (4) sending funds to family members of Antoine and others at Antoine's direction.

9.     Intermediary Company 1 was another company, like JD Locator, used to conceal the bribe payments from Corporation X.  **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** would authorize wire transfers to Intermediary Company 1's bank account at Ocean Bank from Corporation X's bank accounts.  These wires were intended for Robert Antoine.  Over the course of the conspiracy, **ESQUENAZI** and **RODRIGUEZ** would cause approximately $130,000 to be transferred to Intermediary Company 1's bank account from Corporation X for purported "consulting services," when, in fact, such services were never rendered or intended to be rendered.  Upon receipt of such funds, Co-conspirator A, at Antoine's direction, would wire the funds to Antoine's

9

Washington Mutual bank account or issue checks to Antoine, which were then deposited in Antoine's Washington Mutual bank account.

10.     In another effort to direct bribe payments to Robert Antoine, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** would send prepaid calling cards, valued at approximately $14,625, to Co-conspirator B, who would then sell the cards at his store and give Antoine the cash from the sales.

11.     After Jean Rene Duperval assumed the role of Director of International Relations, which had previously been held by Robert Antoine, **JOEL ESQUENAZI** and the General Counsel would assist in the incorporation of Telecom Consulting as a shell company for the benefit of Duperval. Telecom Consulting was an intermediary company used to conceal bribe payments from **ESQUENAZI** and **CARLOS RODRIGUEZ** to Duperval. **MARGUERITE GRANDISON** would be listed as Telecom Consulting's President and was its sole officer. The General Counsel would be listed as the registered agent of Telecom Consulting.

12.     With the aid of **JOEL ESQUENAZI**, **MARGUERITE GRANDISON** would establish a bank account in the name of Telecom Consulting and list herself as the sole signatory on that account. **ESQUENAZI** and **CARLOS RODRIGUEZ** would direct that bribe payments for Jean Rene Duperval be paid to Telecom Consulting. Over the course of the conspiracy, the bank account of Telecom Consulting would receive over $70,000 from Corporation X in bribes via wire transfers and an intrabank transfer from Corporation X. Telecom Consulting would not perform any consulting services of any kind for Corporation X or any other telecommunications company.

13.     **MARGUERITE GRANDISON**, at Jean Rene Duperval's direction, would disburse the funds received from Corporation X and deposited into Telecom Consulting's bank account by:

(1) issuing checks from Telecom Consulting's account made payable to Duperval, which were then deposited into Duperval's bank accounts; (2) issuing checks from Telecom Consulting's account made payable to Duperval, which were then caused to be cashed by Duperval; (3) issuing checks from Telecom Consulting's account made payable to Duperval's family, which were then deposited into Duperval's bank accounts; (4) withdrawing currency from Telecom Consulting's account on behalf of Duperval; and (5) making purchases with funds from Telecom Consulting's account for the benefit on Duperval.

## OVERT ACTS

In furtherance of the conspiracy and to achieve the objects and purposes thereof, at least one of the conspirators committed, or caused to be committed, in the Southern District of Florida, and elsewhere, the following overt acts, among others:

On or about the following dates, **JOEL ESQUENAZI, CARLOS RODRIGUEZ** and Antonio Perez caused checks to be issued from Corporation X's Bank of America bank account, made payable to JD Locator, which were subsequently deposited by Juan Diaz into the JD Locator bank account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Signed by | Approximate Amount |
|-----------|-------------------------------|-----------|--------------------|
| 1 | November 2, 2001 | **CARLOS RODRIGUEZ** | $6,375 |
| 2 | November 30, 2001 | **JOEL ESQUENAZI** | $30,000 |

On or about the following dates, **CARLOS RODRIGUEZ** caused checks to be issued from Corporation X's Bank of America bank account, made payable to JD Locator, which were subsequently deposited by Juan Diaz into the JD Locator bank account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Signed by | Approximate Amount |
|:---:|:---:|:---:|:---:|
| 3 | January 18, 2002 | **CARLOS RODRIGUEZ** | $20,000 |
| 4 | January 24, 2002 | **CARLOS RODRIGUEZ** | $20,000 |

A cashier's check was issued from Corporation X's bank account at International Finance Bank, made payable to JD Locator, which was subsequently deposited by Juan Diaz into the JD Locator bank account:

| Overt Act | Approximate Date Check Issued | Authorized by | Approximate Amount |
|:---:|:---:|:---:|:---:|
| 5 | February 8, 2002 | **CARLOS RODRIGUEZ** | $40,000 |

On or about the following dates, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused checks to be issued from Corporation X's bank account at International Finance Bank, made payable to JD Locator, which were subsequently deposited by Juan Diaz into the JD Locator bank account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Signed by | Approximate Amount |
|:---:|:---:|:---:|:---:|
| 6 | April 12, 2002 | **CARLOS RODRIGUEZ** | $33,818 |
| 7 | May 10, 2002 | **CARLOS RODRIGUEZ** | $25,000 |
| 8 | July 15, 2002 | **CARLOS RODRIGUEZ** | $3,000 |
| 9 | July 17, 2002 | **JOEL ESQUENAZI** | $40,000 |
| 10 | July 24, 2002 | **CARLOS RODRIGUEZ** | $50,000 |
| 11 | August 1, 2002 | **CARLOS RODRIGUEZ** | $40,000 |
| 12 | August 12, 2002 | **CARLOS RODRIGUEZ** | $3,000 |
| 13 | August 14, 2002 | **CARLOS RODRIGUEZ** | $50,000 |

12

On or about the following dates, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused checks to be issued from Corporation X's bank account at SouthTrust Bank, made payable to JD Locator, which were subsequently deposited by Juan Diaz into the JD Locator bank account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Signed by | Approximate Amount |
|-----------|-------------------------------|-----------|--------------------|
| 14 | November 7, 2002 | **CARLOS RODRIGUEZ** | $45,000 |
| 15 | November 22, 2002 | **JOEL ESQUENAZI** | $45,000 |
| 16 | January 22, 2003 | **CARLOS RODRIGUEZ** | $50,000 |
| 17 | January 30, 2003 | **JOEL ESQUENAZI** | $50,000 |
| 18 | February 24, 2003 | **CARLOS RODRIGUEZ** | $25,000 |
| 19 | March 14, 2003 | **CARLOS RODRIGUEZ** | $25,000 |
| 20 | March 24, 2003 | **CARLOS RODRIGUEZ** | $25,000 |
| 21 | March 28, 2003 | **CARLOS RODRIGUEZ** | $25,000 |
| 22 | June 10, 2003 | **JOEL ESQUENAZI** | $3,000 |

23.   On or about February 4, 2002, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused a wire transfer of $20,000 to be sent from Corporation X's bank account at International Finance Bank to JD Locator's bank account.

On or about the following dates, Juan Diaz caused checks to be issued from JD Locator's bank account, payable to Robert Antoine, which were subsequently deposited into Antoine's Washington Mutual Bank account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Approximate Amount | Memo |
|-----------|------------------------------|--------------------|------|
| 24 | August 19, 2002 | $69,750 | Inv# 57645 |
| 25 | November 20, 2002 | $4,900 | Inv 21571 |
| 26 | November 25, 2002 | $4,950 | Inv 21575 |
| 27 | December 5, 2002 | $4,800 | Inv# 21603 |
| 28 | December 10, 2002 | $4,800 | Inv 21614 |
| 29 | December 21, 2002 | $2,465 | Inv 21654 |
| 30 | February 3, 2003 | $4,900 | Inv 037351 |
| 31 | February 7, 2003 | $2,380 | Inv 037382 |
| 32 | February 11, 2003 | $4,900 | Inv 037402 |
| 33 | February 18, 2003 | $4,900 | Inv 037453 |
| 34 | February 21, 2003 | $3,700 | Inv 037492 |
| 35 | March 25, 2003 | $4,500 | Inv 037536 |
| 36 | March 27, 2003 | $4,500 | Inv 037579 |
| 37 | April 7, 2003 | $4,500 | Inv 037612 |
| 38 | April 14, 2003 | $4,500 | Inv 037647 |
| 39 | April 25, 2003 | $4,500 | Inv 037725 |

On or about the following dates, Juan Diaz caused wire transfers to be made from JD Locator's bank account to Robert Antoine's Washington Mutual Bank account, in the following amounts:

| Overt Act | Approximate Date of Wire Transfer | Approximate Amount |
|-----------|-----------------------------------|--------------------|
| 40 | May 31, 2002 | $58,223 |
| 41 | July 22, 2002 | $33,000 |
| 42 | July 30, 2002 | $46,500 |

14

| Overt Act | Approximate Date of Wire Transfer | Approximate Amount |
|-----------|-----------------------------------|--------------------|
| 43 | August 9, 2002 | $37,200 |

44.   On or about August 15, 2003, Juan Diaz cashed a check made payable to himself from the JD Locator bank account for $9,000, which currency he subsequently tendered to Robert Antoine.

45.   On or about August 19, 2003, Juan Diaz cashed a check made payable to himself from the JD Locator bank account for $5,000, which currency he subsequently tendered to Robert Antoine.

On or about the following dates, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused the following wire transfers to be made to Intermediary Company 1's Ocean Bank account from Corporation X's bank account at Bank of America:

| Overt Act | Approximate Date of Wire Transfer | Approximate Amount | Originator to Beneficiary Information |
|-----------|-----------------------------------|--------------------|--------------------------------------|
| 46 | January 8, 2002 | $15,000 | "Consulting Fees" |
| 47 | January 24, 2002 | $18,000 | "Consulting Fees" |

On or about the following dates, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused the following wire transfers to be made to Intermediary Company 1's Ocean Bank account from Corporation X's bank account at International Finance Bank:

| Overt Act | Approximate Date of Wire Transfer | Approximate Amount | Originator to Beneficiary Information |
|-----------|-----------------------------------|--------------------|--------------------------------------|
| 48 | March 5, 2002 | $37,000 | "Consulting Fees" |
| 49 | April 17, 2002 | $35,000 | "Consult. Fees" |

15

| Overt Act | Approximate Date of Wire Transfer | Approximate Amount | Originator to Beneficiary Information |
|---|---|---|---|
| 50 | April 29, 2002 | $25,000 | "Consulting Fees" |

On or about the following dates, Co-conspirator A caused wire transfers to be made from Intermediary Company 1's Ocean Bank account to the Washington Mutual Bank account of Robert Antoine, in the following amounts:

| Overt Act | Approximate Date of Wire Transfer | Approximate Amount |
|---|---|---|
| 51 | March 8, 2002 | $14,000 |
| 52 | March 11, 2002 | $15,000 |
| 53 | April 19, 2002 | $15,000 |
| 54 | May 1, 2002 | $5,000 |

On or about the following dates, Co-conspirator A caused checks to be issued from Intermediary Company 1's bank account, payable to Robert Antoine, which were subsequently deposited into Antoine's Washington Mutual Account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Approximate Amount |
|---|---|---|
| 55 | May 3, 2002 | $4,600 |
| 56 | May 24, 2002 | $16,000 |

57.    On or about October 16, 2003, the General Counsel incorporated Telecom Consulting in the State of Florida, listing himself as the registered agent for Telecom Consulting.

58.    On or about October 17, 2003, **JOEL ESQUENAZI** informed Jean Rene Duperval via interstate electronic mail communication that Telecom Consulting had been created and that a

16

bank account could now be opened.

59.     On or about October 19, 2003, **MARGUERITE GRANDISON** received information via interstate electronic mail communication from Jean Rene Duperval that Telecom Consulting had been created and that a bank account could now be opened.

60.     On or about October 24, 2003, **JOEL ESQUENAZI** sent information about **MARGUERITE GRANDISON** and Telecom Consulting to a SouthTrust Bank employee via interstate electronic mail communication as part of the process of opening a bank account.

61.     On or about November 18, 2003, **MARGUERITE GRANDISON** signed a Telecom Consulting resolution to open a bank deposit account at SouthTrust Bank.

62.     On or about November 18, 2003, **MARGUERITE GRANDISON** opened a checking account at SouthTrust Bank for Telecom Consulting.

63.     On or about November 18, 2003, Telecom Consulting and Corporation X executed a Commission Agreement, between **JOEL ESQUENAZI** and **MARGUERITE GRANDISON**, which listed Telecom Consulting as a consultant who would assist Corporation X in obtaining a contract or contracts with Haiti Teleco.

64.     On or about November 20, 2003, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused an intrabank transfer in the amount of $15,000 to be sent from Corporation X's SouthTrust bank account to Telecom Consulting's SouthTrust bank account.

On or about the following dates, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused the following wire transfers to be sent from Corporation X's SouthTrust bank account to Telecom Consulting's SouthTrust bank account:

17

| Overt Act | Approximate Date of Wire Transfer | Approximate Amount | Originator to Beneficiary Information |
|---|---|---|---|
| 65 | December 16, 2003 | $15,000 | "Consulting Fees" |
| 66 | December 30, 2003 | $10,000 | "Consulting Fees" |
| 67 | January 23, 2004 | $10,000 | "Consultant Fees" |
| 68 | February 3, 2004 | $10,000 | "Consulting Fees" |
| 69 | February 19, 2004 | $5,000 | "Consulting Fees" |
| 70 | March 25, 2004 | $10,000 | "Consulting Fees" |

On or about the following dates, **MARGUERITE GRANDISON** caused checks to be issued from Telecom Consulting's SouthTrust bank account, which were payable to Jean Rene Duperval and subsequently deposited into Duperval's Miami Federal Credit Union account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Approximate Amount | Memo |
|---|---|---|---|
| 71 | March 1, 2004 | $8,000 | none |
| 72 | April 30, 2004 | $8,235 | none |
| 73 | July 12, 2004 | $2,596 | none |
| 74 | July 28, 2004 | $2,596 | "payroll 7/04" |
| 75 | August 27, 2004 | $2,596 | "payroll 8/04" |
| 76 | September 20, 2004 | $2,596 | "payroll-9/04" |
| 77 | December 23, 2004 | $3,000 | "Bonus 2004" |

On or about the following dates, **MARGUERITE GRANDISON** caused checks to be issued from Telecom Consulting's SouthTrust bank account, payable to Jean Rene Duperval, which were subsequently deposited into Duperval's Wachovia bank accounts, in the following amounts:

| Overt Act | Approximate Date Check Issued | Approximate Amount | Memo |
|-----------|------------------------------|--------------------|------|
| 78 | July 28, 2004 | $5,473 | "travel expenses, office supplies" |
| 79 | October 20, 2004 | $2,596 | none |

On or about the following dates, **MARGUERITE GRANDISON** caused checks to be issued from Telecom Consulting's SouthTrust bank account, which were made payable to Jean Rene Duperval, and which Duperval subsequently caused to be cashed, in the following amounts:

| Overt Act | Approximate Date Check Issued | Amount | Memo |
|-----------|------------------------------|--------|------|
| 80 | June 24, 2004 | $2,500 | none |
| 81 | December 15, 2004 | $2,500 | none |
| 82 | March 29, 2005 | $3,000 | none |

83.     On or about December 16, 2003, the same day that Telecom Consulting received a $15,000 wire transfer from Corporation X, **JOEL ESQUENAZI** confirmed with Jean Rene Duperval via interstate electronic mail communication and with **CARLOS RODRIGUEZ** that the billing rate for Corporation X would be reduced from $0.15 per minute to $0.07 per minute.

All in violation of Title 18, United States Code, Section 371.

**COUNTS 2-8**
**Violations of the Foreign Corrupt Practices Act**
**(15 U.S.C. § 78dd-2(a); 18 U.S.C. § 2)**

1.      Paragraphs 1 though 14 of the General Allegations and paragraphs 4 through 13 of the Manner and Means section of Count 1 are re-alleged and incorporated by reference as though set forth herein.

2.      On or about the dates set forth below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**JOEL ESQUENAZI**,
**CARLOS RODRIGUEZ**,
**and**
**MARGUERITE GRANDISON**,

who were domestic concerns and officers, employees and agents of domestic concerns within the meaning of the FCPA, willfully made use of, and aided, abetted, and caused others to make use of, the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official, and to any person, while knowing that the money and thing of value will be offered, given, and promised, directly and indirectly, to any foreign official for the purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist defendants **JOEL ESQUENAZI, CARLOS RODRIQUEZ**, and **MARGUERITE**

20

**GRANDISON**, as well as the General Counsel, Corporation X, and others known and unknown to the Grand Jury, in obtaining and retaining business for and with, and directing business to Corporation X, as follows:

| Count | Approximate Date of Money Transfer | Use of Instrumentality of Interstate Commerce | Intended Foreign Public Official Beneficiary |
|---|---|---|---|
| 2 | November 20, 2003 | Bank transfer of approximately $15,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |
| 3 | December 16, 2003 | Wire transfer of approximately $15,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |
| 4 | December 30, 2003 | Wire transfer of approximately $10,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |
| 5 | January 23, 2004 | Wire transfer of approximately $10,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |
| 6 | February 3, 2004 | Wire transfer of approximately $10,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |
| 7 | February 19, 2004 | Wire transfer of approximately $5,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |
| 8 | March 25, 2004 | Wire transfer of approximately $10,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |

In violation of Title 15, United States Code, Section 78dd-2(a), and Title 18, United States Code, Section 2.

## COUNT 9
### Money Laundering Conspiracy
### (18 U.S.C. § 1956(h))

1.      From in or around November 2001, through in or around March 2005, the exact dates being

unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida, and

elsewhere, the defendants,

**JOEL ESQUENAZI,**
**CARLOS RODRIGUEZ,**
**ROBERT ANTOINE,**
**JEAN RENE DUPERVAL,**
**and**
**MARGUERITE GRANDISON,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine,

conspire, confederate, and agree with each other and with other persons known and unknown to the

Grand Jury, including Antonio Perez, Juan Diaz, the General Counsel, Co-conspirators A and B,

Corporation X, and Intermediary Companies 1 and 2, to commit offenses under Title 18, United

States Code, Sections 1956 and 1957, that is:

(a) knowing that the property involved in the financial transaction represented the proceeds

of some form of unlawful activity, to conduct financial transactions affecting interstate and foreign

commerce, which financial transactions involved the proceeds of specified unlawful activity,

knowing that the transactions were designed in whole and in part to conceal and disguise the nature,

the location, the source, the ownership, and the control of the proceeds of said specified unlawful

activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

(b) to engage in a monetary transaction by, through, and to a financial institution, in and

affecting interstate and foreign commerce, in criminally derived property that was of a value greater

than $10,000.00, that is, the deposit, withdrawal, transfer and exchange of U.S. currency, funds and monetary instruments, such property having been derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

**PURPOSES OF THE CONSPIRACY**

2.      The purposes of the conspiracy were for **JOEL ESQUENAZI, CARLOS RODRIQUEZ, ROBERT ANTOINE, JEAN RENE DUPERVAL** and **MARGUERITE GRANDISON,** and their co-conspirators to conceal the bribe payments paid to **ANTOINE** and **DUPERVAL** by conducting financial transactions with the illegal proceeds in such a manner as to conceal the nature and the source of the proceeds, and to use the illegal proceeds in monetary transactions which were conducted in amounts over $10,000.

**MANNER AND MEANS OF THE CONSPIRACY**

3.      Paragraphs 4 through 13 of the Manner and Means section of Count 1 of this Indictment are re-alleged and incorporated by reference herein as a description of the manner and means by which **JOEL ESQUENAZI, CARLOS RODRIGUEZ, ROBERT ANTOINE, JEAN RENE DUPERVAL, MARGUERITE GRANDISON**, and their co-conspirators sought to accomplish the objects and purposes of the conspiracy.  Further manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purposes of the conspiracy, included, among other things, the following:

4.      Co-conspirator B would incorporate Intermediary Company 2 in Florida.

5.      Co-conspirator B would open a checking account in the name of Intermediary Company 2 at First Union National Bank, in Miami, Florida.

6.      Juan Diaz, at **ROBERT ANTOINE**'s direction, would disburse the funds from the

23

JD Locator bank account by issuing checks on behalf of **ANTOINE** to Intermediary Company 2.

At **ROBERT ANTOINE's** direction and for his benefit, Juan Diaz would issue the following checks from JD Locator's bank account, which were made payable to Intermediary Company 2 and subsequently given to Co-conspirator B:

|   | Check from | Approximate Amount | Memo |
|---|---|---|---|
| 7 | JD Locator | $8,500 | Inv 020747 |
| 8 | JD Locator | $18,500 | Inv 020769 |

9.     Co-conspirator B would deposit these checks from JD Locator into Intermediary Company 2's bank account at First Union National Bank for the benefit of **ROBERT ANTOINE**.

10.     Co-conspirator B would then use **ROBERT ANTOINE's** money that was being held for **ANTOINE** on deposit at Co-conspirator B's First Union National Bank to purchase real property.

11.     Co-conspirator B would sell the real property.

12.     Co-conspirator B would deposit approximately $293,394 from the sale of the real property into Co-conspirator B's personal Bank of America bank account.

13.     Co-conspirator B would issue a check made payable to **ROBERT ANTOINE** in the amount of $145,047 from the Bank of America account, which check would be used to purchase a Bank of America cashier's check, made payable to **ANTOINE**, in the amount of $145,032.

14.     **ROBERT ANTOINE** would deposit a Bank of America cashier's check for approximately $145,032 into his Citibank bank account ending in 2501.

15.     It is further alleged that the specified unlawful activities are violations of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2; violations of the criminal bribery

24

laws of Haiti, The Republic of Haiti's Penal Code Articles 137 and 140; and wire fraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1956(h).

### COUNTS 10 - 21
### Money Laundering
### (18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

1.      On or about the dates set forth below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**JOEL ESQUENAZI,**
**CARLOS RODRIGUEZ,**
**JEAN RENE DUPERVAL,**
**and**
**MARGUERITE GRANDISON,**

knowingly conducted and attempted to conduct, and aided and abetted, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity:

| Count | Approximate Date | Financial Transaction |
|-------|------------------|------------------------|
| 10 | March 1, 2004 | A Telecom Consulting check deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for approximately $8,000 |
| 11 | June 25, 2004 | A Telecom Consulting check caused to be cashed by **JEAN RENE DUPERVAL** for approximately $2,500 |

| Count | Approximate Date | Financial Transaction |
|-------|-----------------|----------------------|
| 12 | July 28, 2004 | A Telecom Consulting check deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for approximately $2,596 |
| 13 | July 29, 2004 | A Telecom Consulting check deposited into **JEAN RENE DUPERVAL's** Wachovia Bank Accounts for approximately approximately $5,473 |
| 14 | August 6, 2004 | A Telecom Consulting check, made payable to a third party, deposited into **JEAN RENE DUPERVAL's** Wachovia Bank Account for approximately approximately $2,518 |
| 15 | August 27, 2004 | A Telecom Consulting check deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for approximately $2,596 |
| 16 | August 27, 2004 | A Telecom Consulting check, made payable to a third party, deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for approximately $2,518 |
| 17 | September 20, 2004 | A Telecom Consulting check deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for approximately $2,596 |
| 18 | September 20, 2004 | A Telecom Consulting check, made payable to a third party, deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for approximately $2,518 |
| 19 | January 6, 2005 | A Telecom Consulting check caused to be cashed by **JEAN RENE DUPERVAL** for approximately $2,500 |
| 20 | January 6, 2005 | A Telecom Consulting check deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for $3,000 |
| 21 | March 29, 2005 | A Telecom Consulting check caused to be cashed by **JEAN RENE DUPERVAL** for $3,000 |

2.     It is further alleged that the specified unlawful activities are violations of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2; violations of the criminal bribery laws of Haiti, The Republic of Haiti's Penal Code Article 137 and 140; and wire fraud, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## CRIMINAL FORFEITURE

1.     Paragraphs 1 though 14 of the General Allegations of this indictment and the violations alleged in Counts 1 through 21 of this indictment are re-alleged and incorporated by reference herein for the purpose of alleging forfeiture to the United States of America of property in which one or more of the defendants has an interest.

2.     Upon conviction of any of the offenses alleged in Counts 1 through 8 of this indictment, the defendants so convicted shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to said offense(s).

3.     Upon conviction of any of the offenses alleged in Counts 9 through 21 of this indictment, the defendants so convicted shall forfeit to the United States any property, real or personal, involved in such offense or any property traceable to such property.

4.     The property subject to forfeiture includes but is not limited to:

    A.     $888,818 in United States currency, representing the amount of proceeds derived from the conspiracy alleged in Count 1;

    B.     $75,000 in United States currency, representing the amount of proceeds constituting or derived from the offenses alleged in Counts 2 through 8;

    C.     all money or other property that was the subject of each transaction,

transportation, transmission, or transfer, in violation of Title 18, United States Code, Section 1956;

D.     all commissions, fees and other property constituting proceeds obtained as a result of a violation of Title 18, United States Code, Section 1956;

E.     all property used in any manner or part to commit or to facilitate the commission of a violation Title 18, United States Code, Section 1956; and

F.     all property traceable to the money or other property subject to forfeiture under categories C, D and E above.

5.     Substitute Asset Provision

If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

A.     cannot be located upon the exercise of due diligence;

B.     has been transferred or sold to, or deposited with, a third party;

C.     has been placed beyond the jurisdiction of the court;

D.     has been substantially diminished in value; or

E.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

6.     If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount derived from such offense.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) made applicable hereto by

28

Title 28, United States Code, Section 2461; Title 18, United States Code, Section 982(a)(1) and (b)(2)

and the procedures outlined at Title 21, United States Code Section 853, and set forth in Fed. R. Crim.

P. 32.2.

A TRUE BILL

FOREPERSON OF THE GRAND JURY

Date: November____, 2009
      DECEMBER 4, 2009

JEFFREY H. SLOMAN
ACTING UNITED STATES ATTORNEY

Aurora Fagan
Assistant United States Attorney

STEVEN A. TYRRELL, CHIEF
MARK F. MENDELSOHN, DEPUTY CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

By:    Nicola J. Mrazek
       Trial Attorney

RICHARD WEBER, CHIEF
ASSET FORFEITURE AND MONEY LAUNDERING SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

By:    Kevin Gerrity
       Trial Attorney

29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

**JOEL ESQUENAZI,**
**CARLOS RODRIGUEZ,**
**ROBERT ANTOINE,**
**JEAN RENE DUPERVAL,**
**and**
**MARGUERITE GRANDISON,**

Defendants.
_____/

CASE NO. _____

**CERTIFICATE OF TRIAL ATTORNEY***

**Superseding Case Information:**

**Court Division:** (Select One)

x   Miami  ____  Key West
____ FTL   ____  WPB  ____  FTP

New Defendant(s)       Yes ____  No ____
Number of New Defendants   ____
Total number of counts      ____

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:      (Yes or No)    __No__
     List language and/or dialect    _____

4.   This case will take    __15__    days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

     (Check only one)                              (Check only one)

     I     0  to  5 days        _____          Petty      _____
     II    6  to 10 days        _____          Minor      _____
     III   11 to 20 days        __X__           Misdem.    _____
     IV    21 to 60 days        _____          Felony     __X__
     V     61 days and over     _____

6.   Has this case been previously filed in this District Court? (Yes or No)   __No__
     If yes:
     Judge: _____   Case No. _____
     (Attach copy of dispositive order)
     Has a complaint been filed in this matter?   (Yes or No)   __No__
     If yes:
     Magistrate Case No. _____
     Related Miscellaneous numbers:   09-20346-JEM and 09-20347-JEM
     Defendant(s) in federal custody as of _____
     Defendant(s) in state custody as of _____
     Rule 20 from the _____   District of _____

     Is this a potential death penalty case? (Yes or No)   __No__

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?   ____  Yes   __X__  No

8.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?   ____  Yes   __X__  No

_Aurora Fagan_
Aurora Fagan
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 188591

*Penalty Sheet(s) attached

REV 4/8/08

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**   JOEL ESQUENAZI   **Case No:** _____

Count 1:

Conspiracy

Title 18, United States Code, Section 371

**\*Max Penalty**:   5 Years' Imprisonment

Counts 2-8:

Violation of Foreign Corrupt Practices Act

Title 15, United States Code, Section 78dd-2

\* **Max.Penalty:**   5 Years' Imprisonment

Count 9:

Money Laundering Conspiracy

Title 18, United States Code, Section 1956(h)

\* **Max.Penalty:**   20 Years' Imprisonment

Counts 10 -21:

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

\* **Max.Penalty:**   20 Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**   CARLOS RODRIGUEZ   **Case No:** _____

Count 1:

Conspiracy

Title 18, United States Code, Section 371

**\*Max Penalty**:   5 Years' Imprisonment


Counts 2-8:

Violation of Foreign Corrupt Practices Act

Title 15, United States Code, Section 78dd-2

**\* Max.Penalty:**   5 Years' Imprisonment


Count 9:

Money Laundering Conspiracy

Title 18, United States Code, Section 1956(h)

**\* Max.Penalty:**   20 Years' Imprisonment

Counts 10 -21:

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

**\* Max.Penalty:**   20 Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name: __ROBERT ANTOINE_____    Case No: _____

Count 9:

_____Money Laundering Conspiracy_____

_____Title 18, United States Code, Section 1956(h)_____

* Max.Penalty:_____20 Years' Imprisonment_____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**   JEAN RENE DUPERVAL         **Case No:** _____

Count 9:

Money Laundering Conspiracy

Title 18, United States Code, Section 1956(h)

**\* Max.Penalty:**      20 Years' Imprisonment

Counts 10 -21:

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

**\* Max.Penalty:**      20 Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   MARGUERITE GRANDISON   **Case No:** _____

Count 1:

Conspiracy

Title 18, United States Code, Section 371

**\*Max Penalty**:   5 Years' Imprisonment


Counts 2-8:

Violation of Foreign Corrupt Practices Act

Title 15, United States Code, Section 78dd-2

**\* Max.Penalty:**   5 Years' Imprisonment


Count 9:

Money Laundering Conspiracy

Title 18, United States Code, Section 1956(h)

**\* Max.Penalty:**   20 Years' Imprisonment

Counts 10 -21:

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

**\* Max.Penalty:**   20 Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**